Vivian Hart UNSEL and Junior Bud Unsel, her husband, all living heirs of Vivian Hart Unsel, and all unborn and unascertainable heirs of Vivian Hart Unsel; Judith Ann Hampton Hunt Daniels and Bobby Donald Daniels, her husband, all living heirs of Judith Ann Hampton

Hunt Daniels, and all unborn and unascertainable heirs of Judith Ann Hampton Hunt Daniels; Lena Hart Hampton, single, all living heirs of Lena Hart Hampton, and all unborn and unascertainable heirs of Lena Hart Hampton; James K. Hampton and Kathleen Burke Hampton, all living heirs of James K. Hampton, and all unborn and unascertainable heirs of James K. Hampton, Petitioners–Respondents,

v.

Mary Hart MEIER and Louis Meier, her husband, all living heirs of Mary Hart Meier, and all unborn and unascertainable heirs of Mary Hart Meier; Helen Hart Mahew, single, all living heirs of Helen Hart Mahew, and all Unborn and Unascertainable Heirs of Helen Hart Mahew; Martha Hart Mahew and Donnell Mahew, Her Husband, all Living Heirs of Martha Hart Mahew, and all Unborn and Unascertainable Heirs of Martha Hart Mahew; Anne Hart Dial and Taylor Dial, her husband, all living heirs of Anne Hart Dial, and all unborn and unascertainable heirs of Anne Hart Dial; Kay Hart Sides and James Sides, her husband, all living heirs of Kay Hart Sides, and all unborn and unascertainable heirs of Kay Hart Sides; Harry Thomas Hart, Jr., and Beverly Hart, his wife, all living heirs of Harry Thomas Hart, Jr., and all unborn and unascertainable heirs of Harry Thomas Hart, Jr.; Louise Stepp Aston and Harold Aston, her husband, all living heirs of Louise Stepp Aston, and all unborn and unascertainable heirs of Louise Stepp Aston, Respondents–Appellants.

No. 21489.

Missouri Court of Appeals,
Southern District,
Division Two.

April 30, 1998.

Motion for Rehearing and Transfer to Supreme Court Denied May 22, 1998.

Application for Transfer Denied
Aug. 25, 1998.

**468**

John D. Harding, Limburgh, Russell, Payne & Howard, Cape Girardeau, for Appellants.

David Potashnick, Sikeston, for Respondents.

SHRUM, Judge.

In this partition lawsuit, Appellants charge that the trial court erred in deciding the present ownership of entailed and fee interests in certain real estate.

Questions about ownership interests arose because Vivian Hart Unsel (Vivian) adopted her niece, Judith Hart Daniels (Judith). Vivian owned an entailed interest in the subject land but had no children or other lineal descendants until the adoption. Four years after the adoption, Vivian died. But for the adoption, Vivian's death would have vested Appellants and Lena Hart Hampton (Lena) with the remainder interest in the tracts in which Vivian held a life estate.

The trial court found that Judith, as the adult adoptee of Vivian, took the remainder interest in Vivian's life estate interests in the land. Appellants say that they and Lena—

not Judith—were entitled to those remainder interests. They present three arguments as to why this is true.

First, Appellants say that recognition of this adoption gives Judith a "dual inheritance" from her grandparents, contrary to the clear intent expressed in her grandparents' wills.

Second, Appellants say that the evidence compels a finding that this adoption was a sham, i.e., done for the sole purpose of making Judith an additional taker under the grandparents' wills and defeating the reversion of Vivian's interests to other heirs.

Third, Appellants maintain that "[p]ublic policy should not recognize an adoption done for the express purpose of creating an additional share in a natural heir of a testator when no such intent has been expressed by the testator."

We agree with Appellant's first and third contentions. We reverse and remand with directions.[1]

## FACTS

When John T. Hart (John T.) died testate in 1966 he owned a fee simple ownership interest in the five subject land parcels. He owned all of tract III in fee simple via an outright purchase during his lifetime. However, his fee ownership in tracts I, II, IV, and V was limited to certain undivided shares in each parcel.[2]

John T.'s will, made in 1965, devised tract III "absolutely and in fee simple" to his wife, Willie Pearl Hart (Willie). As to all other land, John T.'s will read:

"All the remaining of my farmland, real estate and undivided interest in farmland

---

1. Because we agree with Appellants' first and third arguments, we need not address their second argument.

2. To explain, John E. Hart (father of John T.) died testate in 1911. By his will John E. devised a life estate in "all of [his] real estate" to his wife, Josephine. Then he devised to his son John T. "an undivided one third interest in ... all real estate ... for his life, subject to the life estate of his mother, remainder to his heirs." John E. made the exact same provision for daughters Lizzie Hampton and Ida Stepp. In 1921, John T. acquired another interest in tracts I, II, IV, and

V by deed from Lizzie Hampton and her presumptive heirs. In 1940, John T. acquired a further interest in tracts I, II, and IV—but not tract V—via deed from Ida Stepp and her presumptive heirs. Consequently, when John T. died, he owned an undivided two-thirds fee interest in tracts I, II, and IV. He also owned an undivided one-third fee interest in tract V. Ida's heirs still owned the one-third interest in tract V that came to them from John E.'s will. The additional one-third interest in tracts I, II, IV, and V had already passed directly to John T.'s heirs when he died pursuant to John E.'s will.

and real estate which I own or have any interest in, I do give, devise and bequeath unto my children, HELEN HART MA-HEW, MARTHA HART MAHEW, VIVI-AN HART UNSEL, LENA HART HAMPTON, MARY HART MEIER, and HARRY T. HART'S CHILDREN, and to their bodily heirs; it being my intention that at my death the interest of my children in all farmland in which I have an interest and which I have not heretofore disposed of be an equal fee tail interest, and that at my death all of the children born after the death of my father, John E. Hart, have the same interests in the farmland owned by my father, John E. Hart at the time of his death, as those children of mine who were born before the death of my father, John E. Hart, and that said interest be entailed and that any land which my father, John E. Hart, owned at the time of his death which I now own, at my death the interest to my said children therein shall be equalized and be entailed; and that my deceased son Harry's interest shall go to the children of my deceased son, HARRY T. HART, in fee tail, it being my intention that the one-sixth share that I would have devised to my son, HARRY T. HART, I do give unto his children, HARRY THOMAS HART, JR., KAY HART SIDES and ANN HUNTER HART, and their bodily heirs."

In 1973, Willie died. By her will, she devised an "undivided five-sixth interest in [tract III] unto ... children HELEN HART MAHEW, MARTHA HART MAHEW, VI-VIAN HART UNSEL, LENA HART HAMPTON and MARY HART MEIER, and to their bodily heirs." Willie also devised "an undivided one-sixth interest in [tract V] unto HARRY T. HART, JR., KAY HART SIDES and ANN HUNTER HART, the children of my deceased son HARRY T. HART, and their bodily heirs; it being my intention to create a fee tail estate by this clause of my will." The six children born to John T. and his wife Willie were their natural children—none were adopted.

On February 11, 1992, Vivian (John T.'s daughter) adopted her sister Lena's adult daughter, Judith. Judith was over forty years old when adopted. Although Vivian's exact age is not shown, she apparently was more than eighty years old in 1992. Vivian's husband, Junior (Bud) Unsel (age 60–70) joined in the adoption.

Evidence concerning this adoption included the following. The adoption was "Vivian and Bud's idea." They wanted to adopt because they needed "an heir ... [f]or the property ... in Portageville ... that [Vivian] had for 90 years worth of life." Moreover, Judith had "always been close to Vivian[ ] and Bud-dy." The adoption, however, did not affect the relationship between Judith, Vivian, and Bud. Judith and Vivian remained "as close" as before and they "visited all the time[;]" yet Judith never lived or stayed with her adoptive parents. She never had a bedroom at Vivian's and Bud's house, never called them mom or dad, and never used the adoptive name Unsel as part of her legal name. Despite the adoption, Judith still considered Lena Hampton her mother. Likewise, in Lena's view she still acted "as a mother [in her] dealings with Judy[ ]" and loved her "with all [her] heart." When asked if Judith's adoption changed the family relationship among Judith, James Hampton (Lena's other naturally born child), and her, Lena answered: "Not at all."

Vivian died February 29, 1996, with no descendants other than her adopted daughter, Judith. The question then arose: Who became vested with the remainder interest in the tracts in which Vivian had a life estate? The trial court answered "Judith." This appeal followed.[3]

## DISCUSSION AND DECISION

■ By the phrase "bodily heirs" in their wills, John T. and Willie created estate tails in the subject tracts of real estate. *See Davidson v. Davidson,* 350 Mo. 639, 167 S.W.2d 641, 642[1] (Mo.1943). The effect of

---

**3.** In 1995, Vivian and her husband made a beneficiary deed for the subject tracts. The named "Grantee Beneficiary(ies) were Judith Hampton Daniels, if living; if not, to James Keith Hamp-

ton, per stirpes." Consequently, Vivian's fee simple interests in the land are not an issue on appeal.

§ 442.470, RSMo 1994[4] (originally enacted in 1825) is to convert each estate in tail "into an estate for life in the first taker, with the remainder in fee to the person to whom the estate tail would, on the death of the first taker, pass according to the course of the common law." *Id.* 167 S.W.2d at 642[3]. Consequently, by these wills and this statute, Lena held a life estate interest in the various tracts and the heirs of her body took the contingent remainder interests in fee. *See Davidson*, 167 S.W.2d at 642[4].

No one disputes that, absent the adoption and provided Judith survives Lena, she (Judith) would take at least one half of the remainder interest devised through Lena. Respondents assert, however, that Judith's adoption and application of § 453.090 eliminate her from any prospect of taking a remainder interest through Lena.[5] Specifically, Respondents argue that § 453.090.1 "separated Judith ... from Lena ... for all legal intents and purposes including inheritance by Judith of her natural mother's residuary life estate."

Appellants argue to the contrary. Relying upon *Morris v. Ulbright*, 558 S.W.2d 660 (Mo.banc 1977), they assert that Judith will still get a remainder interest via Lena's entailment once Lena dies. Appellants maintain that to recognize Judith's adoption raises the prospect of Judith's receiving double shares through her grandparents, a result they say is contrary to both public policy and the testators' intent. *See Mississippi Valley Trust Co. v. Palms*, 360 Mo. 610, 229 S.W.2d 675, 678 (1950).

As noted, Appellants' contention that Judith will get a double share stems from *Morris*, 558 S.W.2d 660. In *Morris*, the grantors created estate in tail by deed with the first grantee (Logan Mitchell Ulbright) taking a life estate. The heirs of his body (son, Logan M. Ulbright, Jr.) took a contingent remainder. After Logan, Jr. was adopted, his biological father died. The adoptee sued, claiming he was entitled to the remainder interest despite his adoption by others. Essentially, the defendants in *Morris* made the same arguments as Respondents make here, i.e., that because of § 453.090 the adoption removed adoptee from the life tenant's blood stream "and with no exception ceased and determined all rights and duties between [adoptee] and his natural father." *Id.* at 661. Three members of the *Morris* court disagreed. Judge Donnelly, joined by Judges Morgan and Henley, concluded that the adoptee derived his interest as "purchaser" from his grandparents and not by inheritance from his natural father. *Id.* With that as their premise, they held that adoptee's "interest in the land was not extinguished by the adoption and provisions of § 453.090 ... because his interest in the land does not derive from his natural father." *Id.* The three judges voted to reverse the judgment adverse to adoptee and remanded the case. Judges Bardgett and Seiler concurred in the result.

The two dissenting judges (Finch and Rendlen) agreed with Judge Donnelly that "one who qualifies as an heir of the body takes his interest by purchase and not by inheritance." *Id.* at 661. However, they disagreed with the notion that applying this rule without further analysis resolved the issues presented. Judge Finch, author of the dissent, wrote:

"The disposition of the property in this case must be controlled by the intent of the grantor as it may be determined within

---

4. All statutory references are to RSMo 1994, unless otherwise indicated.

5. In pertinent part, § 453.090 provides:

"1. When a child is adopted ..., all legal relationships and all rights ... between such child and his natural parents ... shall cease and determine. Such child shall thereafter be deemed and held to be for every purpose the child of his parent ... by adoption, as fully as though born to him ... in lawful wedlock.

"2. Such child shall be capable of inheriting from, and as the child of, his parent ... by adoption as fully as though born to him ... in lawful wedlock....

. . . .

"4. The adopted child shall be capable of inheriting from and taking through his parent ... by adoption property limited expressly to heirs of the body of such parent ... by adoption.

"5. The word 'child' as used in this section, shall unless the context hereof otherwise requires, be construed to mean either a person under or over the age of eighteen years."

the four corners of the deed.... In this case, the words chosen provide little guidance in and of themselves. However, a wealth of statutory guidance has been provided as to the meaning of the words chosen. The deed itself offers not even the slightest nuance that the grantors intended anything other than the established statutory meaning. If any actual intent may be found at all, it is that the words were chosen precisely to achieve the effect supplied by the statute."

558 S.W.2d at 666. Judge Finch noted that the identical "cease and determine" language of § 453.090.1 had been part of the adoption code since 1917, some 30 years before the grantors made a deed using fee tail language. He observed that "[i]f any intent on the part of the grantors here may be discerned, their selection of the fee tail form of transfer evidences an intent to keep the land in the family." Id. at 667. The dissenters characterized § 453.090.1 and case law interpreting § 453.090.1 as accomplishing the grantor's intent, i.e., by removing the adoptee out of the family.[6] Consequently, they urged affirmance of the judgment against adoptee.

As stated, Morris lacked concurrence of a majority of the judges except as to result. Accordingly, in some respects it is not controlling as precedent and has value only as instruction. See Williamson v. Cox, 844 S.W.2d 95, 99[4] (Mo.App.1992). Yet, Morris is more instructive than most non-majority opinions. First, five judges in Morris agreed that bodily heirs take their interest in real estate by purchase and not inheritance. Second, the prospect of dual shares going to one person from a common ancestor because of adoption was not an issue in Morris. Contrarily, that was the issue in Palms and is the issue here. Third, Judges Finch and Rendlen conceded that cases involving construction of a will or trust were distinguishable.

For the reasons stated by Judge Donnelly in Morris, we hold that Judith's remainder interests in the subject real estate derived from her grandparents through Lena were not extinguished by the adoption and the provisions of § 453.090. Consequently, the trial court's decision that Judith got remainder interests through Vivian when Vivian died raises the prospect of Judith getting dual shares through common ancestors. Appellants argue that this is prohibited by Palms.

In Palms, adoptees within the "blood stream" of a common ancestor who also had an adoptive parent in the blood stream of the common ancestor were in a position to receive double portions of an entailed estate. The Palms court declared as a matter of public policy such an adoptee would not be allowed a double share.

"When one is in testator's blood stream and an heir at law through one's own blood mother does the artificiality of an adoption by a blood relative reopen the blood stream a second time for the purpose of a double share of the inheritance? We do not think so."

229 S.W.2d at 680. Continuing, the Palms court stated:

"It is the spirit and purpose of the adoption statutes, and the public policy of the state, to help give the adopted child as good a chance in the world as children in general have. The welfare of a child is a fundamental interest of the state. Adoption is a means 'to provide homes and proper nurture, education and training for children who have lost their parents, or for children whose parents, because of misfortune or improvidence, are unable to properly rear and educate them.' It is no part of the public policy of the state that adoption should operate as an instrumentality for dual inheritance, with resulting animosity and litigation among those whom a testator provided in his will should share

6. For example, the dissent cited St. Louis Union Trust Co. v. Hill, 336 Mo. 17, 76 S.W.2d 685 (banc 1934) which involved construction of a will which left to Frank Hill, Jr. a life estate with a remainder in fee to his "heirs at law." The Hill court interpreted (now § 453.090) as taking an adopted child out of the blood stream of its natural parents and placing that child, by operation of law, in the blood stream of its adoptive parents. Id. 76 S.W.2d at 689. The dissent noted this and numerous cases, as well as applicable statutes, available as an aid in determining grantor's intent.

with equality and per stirpes. And the denial of dual inheritance under these circumstances is not opposed to the public policy of promoting the welfare of adopted children."

*Id.* at 681[12].

Three years after the *Palms* case was decided, our supreme court en banc declared: "We find no fault with the result reached in ... *Mississippi Valley Trust Co. v. Palms,* supra." *Wailes v. Curators of Central College,* 363 Mo. 932, 254 S.W.2d 645, 650 (1953). Continuing, the *Wailes* court explained:

"'Adoptions are granted primarily for the best interests of the child adopted. Generally the change by adoption is one of gain. The new status is a better one than the former. To grant dual inheritance, the child adopted would be given the inheritance of a natural child and allowed an additional one. The law intended to give the child adopted the same rights and advantages of a natural child as far as possible. It was never intended to give the child of adoption more.'"

*Id.* (quoting *In re Brenner's Estate,* 109 Utah 172, 166 P.2d 257, 260 (1946)).

Based on the public policy declared in *Palms* and *Wailes,* we hold that an adoption cannot be recognized for the purpose of allowing an adoptee in the blood stream of a common ancestor who is adopted by a parent in the same blood stream to receive a double share of interest in an entailed estate. Thus, the adoption of Judith by Vivian and Bud cannot be recognized to allow Judith to receive shares from both Lena and Vivian. To recognize Judith's adoption in relation to the entailed interest would enable her to receive a double share and would violate the expressed public policy of this state.

In addition to violating public policy, allowing Judith to receive a double share of the entailed interest would violate the intent of John T.'s will. John T.'s will states the intention that his children have "an equal fee tail interest." The will further declares that the interest John T. owned in land which his Father (John E.) owned, "shall be equalized and be entailed." This language expresses an intent to pass equal shares in fee tail.

Furthermore, John T.'s will gives the one-sixth interest that would have passed to his deceased son Harry to Harry's three children and "their bodily heirs." While not specifically saying that Harry's children would receive Harry's share per stirpes, the distribution described in John T.'s will is a per stirpes distribution.

Again, we turn to the *Palms* case, which states:

"We find nothing in this will to indicate any intention that one grandchild, or that the children of any one of testator's children should have more than one share of the ... trust estate. Any intention so capricious and inequitable cannot be read into the will. We think the contrary intention is clear. The dominant purpose of testator to treat his children, and the respective children of any and all of testator's seven children, with even handed equality bespeaks testator's intention that the ... trust estate should have strict per stirpes division his grandchildren taking only such a share as their natural ancestor would have taken if living."

229 S.W.2d at 681.

As in *Palms,* the will of John T. seeks to treat his children and grandchildren equally. The will does not provide for any child or grandchild to receive a double share. In regard to the subject tracts passed through John T.'s will, a recognition of Judith's adoption that would allow her to receive a double share would be contrary to the intent expressed in John T.'s will.

After a full consideration of this case, we are persuaded that the trial court erred in adjudging the remainder interests through Vivian to be vested in Judith. The judgment of the trial court is therefore reversed and the case is remanded with directions to proceed in accordance with the views herein expressed.

MONTGOMERY, C.J., and BARNEY, J., concur.